Linda JACKS, Respondent
Below, Appellant,

v.

DIVISION OF FAMILY SERVICES AND OFFICE OF the CHILD ADVOCATE, Petitioner Below, Appellee.

No. 497, 2008.

Supreme Court of Delaware.

Submitted: March 25, 2009.
Decided: May 14, 2009.
Corrected: May 19, 2009.

---

34. Del.Code Ann. tit. 13, § 722(a)(5).

35. Del.Code Ann. tit. 13, § 722(a)(6).

36. Del.Code Ann. tit. 13, § 722(a)(7).

37. Del.Code Ann. tit. 13, § 722(a)(8).

Kelly J. Sasso, Wilmington, for appellant.

Theresa A. Sediver, Department of Justice, Wilmington, for appellee.

Nicholas M. Krayer, Office of the Child Advocate, Wilmington, for the Office of the Child Advocate.

Before STEELE, Chief Justice, BERGER, and JACOBS, Justices.

STEELE, Chief Justice:

Linda Jacks appeals from an order of the Family Court terminating her parental rights in her four children.[1] On appeal, Jacks claims that the Family Court abused its discretion by finding that terminating her parental rights was in the best interests of her children. We find no merit to Jacks' argument and affirm.

### FACT AND PROCEDURAL BACKGROUND

Linda Jacks is the biological mother of four children—B.J., R.H., D.J., and N.J. Jacks' eldest child, B.J., was born prematurely in 1998. Dr. Shirley Klein, B.J.'s pediatrician, became concerned about B.J.'s welfare when Jacks failed to bring her for checkups. As a result, Dr. Klein could not track B.J.'s weight and overall development, a requirement for the proper care of premature infants. R.H., Jacks' second child who was born on March 3, 2000, also was not regularly taken for medical appointments. Dr. Klein suspected that R.H. was not receiving adequate nu-

trition because she seemed extremely hungry and drank large amounts of formula during the appointments Jacks actually attended. Dr. Klein referred the family to Public Health authorities so that a nurse could check on the children at home twice a week. Around this time, an anonymous caller placed the first of eleven hotline referrals concerning Jacks to the Division of Family Services.

During the summer of 2000, R.H. continued to lose weight. Dr. Klein admitted R.H. to the hospital to determine the cause of R.H.'s failure to thrive. R.H. steadily gained weight during her eight days in the hospital, which suggested to Dr. Klein that R.H. was not receiving enough food at home. Dr. Klein ordered numerous tests to rule out any organic causes for the child's weight loss. The results of those tests supported Dr. Klein's opinion that R.H. simply was not being fed enough.[2] Dr. Klein recognized that R.H. gained substantial weight during two hospitalizations.

During this time, three callers referred the family to the DFS hotline.[3] These referrals reported that: the children failed to thrive; there was not enough formula in the home; the children were being neglected; and R.H. was possibly being physically abused. DFS assigned a Public Health Nutritionist, Ms. Duchesneau, to the family. Duchesneau witnessed the children not receiving enough formula, not having their prescriptions filled, Jacks not keeping food journals when asked, Jacks failing to apply for WIC benefits, and Jacks refusing to get out of bed when transportation to medical appointments ar-

---

1. The children and their respective birth dates are: B.J., 1/17/98; R.H., 3/3/00; D.J., 6/16/01; and N.J., 7/8/05.

2. Dr. Klein testified that R.H. had some health issues that may have contributed to her failure to thrive (including disagreement with

her formula and colitis), but she felt that these issues could only explain some of her weight problems.

3. The DFS Hotline received calls in June, July, and August of 2000.

rived. Additionally, Duchesneau visited the home many times and witnessed B.J. and R.H. sitting alone, unsupervised, and without stimulation.

Jacks' third child, D.J., was born June 16, 2001. No doctor examined D.J. until he was three months old. Dr. Klein only saw D.J. once in the first thirteen months of his life. D.J. steadily fell to the bottom of the growth charts, missed immunizations, and was not taken to follow up appointments regarding the possibility that he may have cerebral palsy. By April 2003, the family had been the subject of eight DFS hotline referrals. The eighth referral suggested that the children were being physically abused. During one of R.H.'s hospitalizations, Dr. Allan DeJong, a child abuse expert, examined R.H., and found marks indicating healed wounds that had been purposefully inflicted. Because of the continuous reports of neglect and the evidence of possible abuse, all three children were removed from the home in April of 2003.

The children immediately began to thrive in their foster care placements. Each child gained significant weight and exhibited improvements in his or her developmental abilities. Jacks did not visit the children while they were in foster care, or otherwise plan for their return. After spending a year in foster care, the children were ultimately placed with relatives, but those relatives returned the children to Jacks shortly after she gave birth to her fourth child, N.J., in July of 2005.

Jack's took N.J. to a different pediatrician, Dr. Alouf. That doctor expressed concerns similar to Dr. Klein's—that N.J. failed to gain weight, was not taken for blood work, and missed several medical appointments. Dr. Klein also reported that once back in their mother's care, all of the children again began to miss medical appointments. D.J. was not taken to fol-

low up appointments regarding dental work, hearing difficulties, and ADHD symptoms.

DFS received a ninth hotline referral in November 2006, reporting that R.H. had lost weight since returning to her mother's care. When the DFS investigated these allegations, the children reported that their mother beat them and that they missed significant amounts of school. By November 2006, B.J. had seven unexcused absences, R.H. had thirteen unexcused absences, and D.J. had seventeen unexcused absences. DFS also found the home to be filthy.

Because of their abuse and neglect, the children were again placed in foster care in November 27, 2006. They remained in foster care only a few days before being placed with their maternal grandparents. During this time, the children's maternal grandmother entrusted their care mainly to their mother. During the remainder of the 2006–2007 school year, the children continued to miss significant amounts of school and medical appointments. Despite these facts, the children were place back with their mother in March of 2007.

DFS received a tenth hotline referral in April of 2007 in which the caller described numerous scratches and marks on D.J. After an investigation, DFS allowed the children to remain in the home. In August 2007, DFS received the eleventh hotline referral. The caller reported that D.J., now six years old, had been playing with a lighter and set a comforter on fire. B.J. and R.H. reportedly attempted to wake their mother during the fire, but were unsuccessful. DFS ultimately removed the children a third time because of a lack of electricity in the home and Jacks' recent apartment eviction.

Again, the children improved significantly in foster care. B.H. and R.H. improved

academically and gained twelve to fifteen pounds each. N.J. gained seven to eight pounds since placement and began calling her foster father "daddy." D.J. also adjusted well to his foster care placement. During their placement, Jacks was relatively uninvolved in the children's care. She did not attend their mental health treatments or regularly visit them.

On February 13, 2008, DFS petitioned to terminate the parental rights of both Jacks and the children's fathers.[4] The Family Court heard arguments and testimony during the period April to July of 2008. In August 2008, the Court ordered the termination of Jacks' parental rights. Jacks appeals from that ruling.

### DISCUSSION

The Family Court found that Jacks had failed to plan for the children's physical, mental, or emotional needs and development, and after considering the best interests of the children, terminated Jacks' parental rights. On appeal, Jacks claims that the Family Court erred in applying the "best interests of the child" test. DFS and the Office of the Child Advocate re-spond that the Family Court's decision has record support and is the product of an orderly and logical reasoning process.

■■■ It is well settled law that the Family Court must conduct a two step analysis when adjudicating a termination petition.[5] First, the court must determine whether DFS has proven, by clear and convincing evidence, one of the grounds for termination listed in 13 Del. C. § 1103.[6] Second, the court must determine whether the decision is in the best interests of the child by weighing the factors found in 13 Del. C. § 722.[7] A determination of the child's best interests must be established by clear and convincing evidence.[8]

Here, Jacks does not dispute that DFS established grounds for termination under 13 Del. C. § 1103. Jacks appeals only the Family Court's determination that terminating her parental rights was in the children's best interests. She claims that the Family Court abused its discretion by finding that three of the 13 Del. C. § 722 factors were either neutral or weighed against her. Those factors are: (1) the wishes of the child as to his or her custodian and residential arrangement; (2) the

---

4. The fathers are not part of this appeal.

5. Powell v. Dep't of Servs. for Children, Youth, and Their Families, 963 A.2d 724, 731 (Del. 2008).

6. Id.

7. 13 Del. C. § 722 provides, in pertinent part:
(a) The Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child. In determining the best interest of the child, the Court shall consider all relevant factors including:
  1. The wishes of the child's parent or parents as to his or her custody and residential arrangements;
  2. The wishes of the child as to his or her custodian(s) and residential arrangements;

3. The interaction and interrelationship of the child with his or her parents, grandparents, siblings, person cohabitating in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;
4. The child's adjustment to his or her home, school and community;
5. The mental and physical health of all individuals involved;
6. Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title;
7. Evidence of domestic violence as provided for in Chapter 7A of this title; and
8. The criminal history of any party or any other resident of the household. . . .

8. Powell, 963 A.2d at 731.

child's adjustment to his or her home, school and community; and (3) the mental and physical health of all individuals involved. With those factors weighed in her favor, Jacks argues, the termination petition should have been denied. DFS and OCA respond that the record evidence supports the Family Court's order, which was the product of an orderly and logical reasoning process, but DFS and OCA do not directly address Jacks' arguments that the court improperly weighted those three § 722 factors.

■ We review Family Court decisions where the court has correctly applied the law for an abuse of discretion.[9] "This Court will not substitute its own opinion for the inferences and deductions made by the Trial Judge where those deductions are supported by the record and are the product of an orderly and logical deductive process."[10]

This case presents two issues. First, did the Family Court correctly weigh the three factors that are the subject of this appeal? Second, is there an alternative basis upon which we may affirm the Family Court's termination order? Because we conclude that the Family Court did not abuse its discretion in weighing those factors, we do not reach the second issue.

### A. The Record Supports the Family Court's Finding That the Wishes of the Children Was a Neutral Factor.

■ The Family Court found that the wishes of Jacks' children were a neutral factor in evaluating their best interests. The court based that finding on its interview of Jacks' three eldest children.[11] B.J. and R.H. told the Family Court that they wanted to live with their mother but were also agreeable to a foster or adoptive home. D.J. said that he wanted to stay with his foster parents and that he disliked his mother's home because it had mice. When asked by the court what he liked about his Mother's home, D.J. responded that he enjoyed his friends, his bike, and his Grandmother. Weighing the facts that B.J. and R.H. appeared open to either returning to their mother or remaining in foster care, that D.J. was emphatic about not returning to his Mother's, and that N.J. was too young to be interviewed, the Family Court found this factor as neutral.

Jacks argues that the children's wishes weighed against termination because D.J. stated that he liked his Grandmother and that, if the children were returned to her, they would reside with her at their Grandmother's home. Jacks also argues that the children's wishes weighed against termination because B.J. and R.H. expressed a desire to be reunited with her, D.J. expressed affection for his grandmother, and the termination would sever that tie. Jacks, however, has not shown that the Family Court's determination was not the product of an orderly and logical reasoning process. With two children open to reunification or remaining in foster care and one child wanting to remain with his foster parents, the Family Court's finding that this factor was neutral is supported by the evidence.

### B. The Record Supports the Family Court's Finding That the Children's Adjustment to Their New Homes, School, and Community Weighed in Favor of Termination.

■ The Family Court found that all four children had adjusted well to their

9. *Id.*

10. *Solis v. Tea,* 468 A.2d 1276, 1279 (Del. 1983).

11. The Family Court did not interview N.J. because she was too young.

foster care settings, which weighed against Jacks. Although B.J. and R.H. had recently been moved to a new foster care placement, the court considered adjustment to their previous foster home placement. B.J. and R.H.'s first foster care mother testified that upon their arrival in her home they were unstructured and screamed, fought, and were disrespectful. In response, the foster mother set a bed and eating schedule, and imposed appropriate discipline. The Family Court found that although the foster mother found their behavior challenging, they had improved and the foster mother believed they were adoptable.

The Family Court also found that both D.J. and N.J. had adjusted very well in their new homes. D.J. appeared very happy and wished to remain in his current home. N.J. had developed a strong bond with her foster parents and had no further eating or health problems. The Family Court found that although changes in the children's current homes were possible, those settings still offered more permanency than anything Jacks could provide.

Jacks claims that this factor should have been weighed against termination. Jacks urged that at the time of the termination hearing, she had been living with the children's maternal grandmother for ten months, and that if the children were returned to her she would continue this living arrangement. She argues that the Family Court should have considered her current stable living arrangement and the fact that her mother's home had been renovated to accommodate the children. She also claims that there was no evidence that she had neglected their schooling when the children had previously lived with her and the maternal grandmother. That factual claim is not before us because Jacks never appealed from the Family Court's contrary

factual determination. Her substantive argument lacks merit.

In fact, the Family Court did consider Jacks' living situation. The court stated "[i]f reunification is pursued, the children would eventually return to maternal grandmother's home where they have resided previous. However ... the Court is not satisfied they would stay there based upon Mother's history." While the children resided with the maternal grandmother from 2006 to 2007, they frequently missed school and medical appointments. Furthermore, Jacks had moved into and out of the maternal grandmother's home numerous times throughout the children's lives. Those facts support the Family Court's finding that the children had adjusted well to foster care and that foster care offered them greater stability than would reunification with Jacks. Jacks has not shown that the Family Court's findings were not the product of a logical and orderly reasoning process.

## C. The Record Supports the Family Court's Finding That the Mental and Physical Health of all Individuals Involved Weighed in Favor of Termination.

■ Finally, the Family Court held that the children's mental health weighed against reunification with Jacks. The court based that determination on the three eldest children's significant mental issues that required ongoing treatment. The Family Court discussed at length the needs of each child and each child's current treatment regiments. The children are currently in counseling and on medication for issues ranging from ADHD to depression and anxiety. Given Jacks' past inabilities to address the children's medical needs, the Family Court weighed this factor against Jacks.

Jacks claims that this factor should have been weighed against termination. She relies on: (1) the Family Court's finding that there were no mental or physical issues with her, the children's fathers, or the maternal grandmother; (2) that her three eldest children had all made progress while in counseling (presumably implying either that their needs had been met or that she could build upon that progress); and (3) that the children's mental health has deteriorated since they entered the foster care system.

These arguments are without merit. At the time of the termination hearing, Jacks had a lengthy history of grossly neglecting her children's physical and mental needs. She offers only unsupported assertions that she was involved in addressing her children's mental health issues, and implies that she would continue to do so if reunited with her children. Furthermore, her claim that the children had made significant progress in therapy—treatment which began after DFS placed the children in foster care—is clearly inconsistent with her claim that the children's mental health deteriorated after they entered foster care. Jacks has failed to indicate how the Family Court's finding was not the product of a logical and orderly reasoning process.

### CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the Family Court terminating Jacks' parental rights.